UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

PAMELA TREADWAY,                    )
                                    )
            Plaintiff,              )
                                    )
    vs.                             )        Case No. 4:14-CV-1957 (CEJ)
                                    )
CAROLYN W. COLVIN, Acting           )
Commissioner of Social Security,    )
                                    )
            Defendant.              )

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

## I. Procedural History

On March 16, 2012, plaintiff Pamela Treadway filed an application for disability insurance benefits, Title II, 42 U.S.C. §§ 401 *et seq.*, and supplemental security income, Title XVI, 42 U.S.C. §§ 1381 *et seq.*, with an alleged onset date of December 30, 2011. (Tr. 68–78, 130–37). After plaintiff's application was denied on initial consideration (Tr. 91–95), she requested a hearing from an Administrative Law Judge (ALJ). (Tr. 96–97).

Plaintiff appeared for a hearing on February 24, 2014. (Tr. 41–67). The ALJ issued a decision denying plaintiff's application on July 28, 2014. (Tr. 7–40). The Appeals Council denied plaintiff's request for review on September 24, 2014. (Tr. 1–6). Accordingly, the ALJ's decision stands as the Commissioner's final decision.

## II. Evidence Before the ALJ

### A. Disability Application Documents

In the Disability Report plaintiff completed on March 16, 2012 (Tr. 178–88), she listed her medical conditions as diabetes, neuropathy in both of her hands and feet, migraine headaches, acid reflux, abdominal pain, arthritis in her right ankle, numbness and pain in the right side of her face, migraines, and depression. In her Work History Report dated April 12, 2012 (Tr. 189–200), plaintiff wrote that in the 15 years before the onset of her alleged disability, she had worked as an office assistant for the St. Louis County government for one year and as a legal assistant for a legal office for six years. As a legal assistant, she updated client files, scheduled appointments, managed client billing, copied documents, and took trips to the court house to file various documents. She was required to use computers, copiers, and calculators for her work. This job required her to walk and stand for one-and-a-half hours, sit for three hours, and write, type or handle small objects for four hours each day. The heaviest weight she lifted was 20 pounds, and she frequently lifted less than 10 pounds. As an office assistant she filed papers and set court dates. In that position she sat for five hours, stood for two hours, and walked for half an hour each day. Prior to the office assistant position, she had worked as a waitress at a diner for six years. (Tr. 230).

In the Function Report plaintiff completed on April 12, 2012 (Tr. 201–11), she described her daily activities as follows: she tested her blood sugar level and took her medication, ate breakfast, took a nap, again tested her blood sugar and medication, ate lunch, took another nap, cooked dinner, tested her blood sugar and took her medication, and attempted to accomplish small household chores between naps throughout the day. Once her migraines started, she wrote that she became "almost incapacitated." (Tr. 201). Also, her medication made her extremely sleepy and high blood sugar levels caused her to feel exhausted. She helped take care of

a pet dog at home, feeding it in the morning and letting it outside several times during the day. (Tr. 201, 204). Her husband fed and let the dog outside at night and bathed the dog weekly. Before the onset of her conditions, plaintiff stated that she was capable of standing or sitting for long amounts of time. Now, she had constant blurred vision in her right eye and constant pain in both feet and legs. At night, she was only able to sleep a few hours at a time.

With respect to her personal care, plaintiff noted that it was very hard for her to wear shoes on both feet. (Tr. 202). However, she did not need special reminders to take care of her personal needs and grooming. Her husband arranged her medication for her on a weekly basis in a pill box and ensured she used the correct insulin dose in her injection pen. Plaintiff prepared her own meals on a daily basis, including sandwiches, cereal, oatmeal, fruit, and meat dinners in a crockpot or Dutch oven. (Tr. 203). Cooking took her 1–2 hours per day, but it took her longer to cook since the onset of her conditions. Plaintiff cleaned, cooked, and did laundry, although she wrote that she needed to take several breaks during these chores.

Plaintiff noted that she no longer drove, because she could not see clearly and her medication made her drowsy. (Tr. 204, 210). Her husband took her grocery shopping 1–2 times a week for approximately 30 minutes to an hour. Plaintiff was capable of paying bills, handling a savings account, and counting change. Her hobbies included watching television and using a computer, because she could not read consistently due to her vision problem. (Tr. 205, 210). Her children and family came over to visit her frequently. Plaintiff needed someone to accompany her when she went out 3–4 times a month to go to doctor's appointments and the

grocery store. She wrote that she hardly attended social functions anymore because she became nervous in crowds. (Tr. 206).

Plaintiff wrote that her conditions made it difficult for her to climb stairs and read small print. She could only walk a short distance before needing a rest and needed to rest 5–10 minutes before she could continue. Plaintiff was capable of finishing what she started and reported that she was good at following written or spoken instructions. She also got along well with authority figures and had never been fired or laid off from a job because of problems getting along with others. (Tr. 207). With respect to her ability to adjust to changes in routine, plaintiff noted that it was difficult for her at first, but she was doing much better. She reported being uncomfortable in noisy places.

In the Disability Report she completed for her appeal (Tr. 215–20), plaintiff wrote that her conditions had changed since her last report. Specifically, plaintiff stated that she had been diagnosed with post-traumatic stress with depression on August 1, 2012 and had had rotator cuff surgery on June 5, 2012. Due to the large amount of medications she was taking, plaintiff noted that she had to limit driving and being away from home. She also had constant leg and foot pain.

Plaintiff's son, Kristoffer R. Tomlinson, and daughter, Rachel Tomlinson, wrote letters regarding their mother's health condition in March 2013. (Tr. 232–33). Mr. Tomlinson wrote that plaintiff's health had declined significantly in the past few years. Her diabetes affected her vision, which made her unstable on her feet. She had not fully recovered from a recent shoulder surgery. They were in the process of evaluating her options for a recently diagnosed back injury. Mr. Tomlinson stated that these ailments in combination made living a normal life very difficult for

plaintiff with regard to driving, working, or keeping a house.  The combination of ailments had restricted plaintiff's movement, such as getting out of bed, getting out of a chair, or going to the bathroom.  Mr. Tomlinson stated that he had been present at many doctors' appointments and stayed overnight during several hospital admissions.

Ms. Tomlinson wrote that her mother was now at a point with her health that made it impossible for her to continue working.  (Tr. 233).  Within the past few years, plaintiff's health had taken a drastic turn for the worse.  Her diabetes caused the nerve endings in her body to tingle with constant pain and made recovering from any health issue extremely difficult.  Ms. Tomlinson noted that her mother recently had found out she might have several bulging discs in her back.  Ms. Tomlinson stated that her mother was not able to drive to work, sit in a chair for extended periods of time, or focus on work that required deep thought and concentration because of her constant pain.

Plaintiff's pharmacy records indicated that she had prescriptions for Metformin[1] 500 mg, Protonix[2] 40 mg, Glimepiride[3] 4 mg, Lantus[4] 100 unit/mL solution, Cymbalta[5] 60 mg, Vicodin[6] 5-500 mg, Humalog[7] KwikPen 100 unit/mL

---

[1] Metformin is an oral medication for the treatment of Type 2 diabetes.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a696005.html (last visited on May 17, 2010).
[2] Protonix, the brand name of Pantoprazole, is a proton-pump inhibitor used to treat the symptoms of gastroesophageal reflux disease (GERD).
https://www.nlm.nih.gov/medlineplus/druginfo/meds/a601246.html (last visited August 18, 2015).
[3] Glimepiride is used to treat type 2 diabetes by lowering blood sugars that cause the pancreas to produce insulin.  https://www.nlm.nih.gov/medlineplus/druginfo/meds/a696016.html (last visited August 18, 2015).
[4] Lantus, the brand name for Insulin Glargine, is an artificial insulin used as an injection to treat type 1 and 2 diabetes.  https://www.nlm.nih.gov/medlineplus/druginfo/meds/a600027.html (last visited August 18, 2015).
[5] Cymbalta, or Duloxetine, is used to treat depression and generalized anxiety disorder; pain and tingling caused by diabetic neuropathy and fibromyalgia.
www.nlm.nih.gov/medlineplus/druginfo/meds (last visited on Oct. 27, 2009).

solution, Divigel[8] 0.25 mg, Flexeril[9] 10 mg, Hydroxyzine[10] 25 mg, Meloxicam[11] 15

mg, Zolpidem[12] Tartrate 5 mg, Cubicin[13] 500 mg solution, Meropenem[14] 1 gram,

Ciprofloxacin[15] 500 mg, Clindamycin[16] 150 mg, and Nystatin.[17]  (Tr. 266–67).  Her

body mass index was 36.73.

## B.  Testimony at the Hearing

Plaintiff was 49 years old on the date of the hearing.  (Tr. 49, 57).  She was

married and had two adult children.   The highest level of education she had

achieved was some college, and she had taken continuing education classes to

---

[6] Vicodin is a narcotic analgesic indicated for relief of moderate to moderately severe pain.
Dependence or tolerance may occur.  See Phys. Desk. Ref. 530-31 (60th ed. 2006).

[7] Humalog, the brand name for Insulin Lispro, is an artificial isnulin used to treat type 1 or type 2
diabetes.  https://www.nlm.nih.gov/medlineplus/druginfo/meds/a697021.html (last visited August 18,
2015).

[8] Divigel, the brand name for Estradiol, is used to treat and prevent hot flashes in women experiencing
menopause.  https://www.nlm.nih.gov/medlineplus/druginfo/meds/a605041.html (last visited August
18, 2015).

[9] Flexeril is indicated as an adjunct to rest and physical therapy for relief of muscle spasm associated
with acute musculoskeletal conditions.  See Phys. Desk Ref. 1832-33 (60th ed. 2006).

[10] Hydroxyzine is used to relieve the itching caused by allergies and to control the nausea and
vomiting caused by various conditions, including motion sickness.  It is also used for anxiety and to
treat the symptoms of alcohol withdrawal.  www.nlm.nih.gov/medlineplus/druginfo/meds (last visited
on Oct. 28, 2009).

[11] Meloxicam is a nonsteroidal anti-inflammatory used to relieve pain, tenderness, swelling, and
stiffness caused by osteoarthritis and rheumatoid arthritis.  It can also be prescribed to treat
ankylosing arthritis.  http://www.nlm.nih.gov/medline
plus/druginfo/meds/a601242.html (last visited on Nov. 4, 2014).

[12] Zolpidem is a sedative-hypnotic used to treat insomnia.  http://www.nlm.nih.
gov/medlineplus/druginfo/meds/a693025.html (last visited on Sept. 1, 2011).

[13] Cubicin, the brand name for Daptomycin, is a cyclic lipopeptide antibiotic used to treat certain blood
infections or serious bacterial skin infections.
https://www.nlm.nih.gov/medlineplus/druginfo/meds/a608045.html (last visited August 18, 2015).

[14] Meropenem is an antibiotic used to eliminate bacteria that cause many kinds of infections, including
pneumonia and urinary tract, skin, bone and stomach infections.
https://www.nlm.nih.gov/medlineplus/druginfo/meds/a696038.html (last visited August 18, 2015).

[15] Ciprofloxacin is a synthetic broad-spectrum antimicrobial agent.  Phys. Desk Ref. 3073 (64th ed.
2010).

[16] Clindamycin is a lincomycin antibiotic used to treat certain types of bacterial infections, including
infections of the lungs, skin, blood, bones, joints, female reproductive organs, and internal organs.
https://www.nlm.nih.gov/medlineplus/druginfo/meds/a682382.html (last visited August 18, 2015).

[17] Nystatin is used to treat fungal infections of the skin, mouth, vagina, and intestinal tract.
https://www.nlm.nih.gov/medlineplus/druginfo/meds/a682758.html (last visited August 18, 2015).

learn computer skills. Plaintiff had a driver's license, but she only drove once or twice a month to pick up prescriptions.

Plaintiff's past employment included working as an office assistant at the St. Louis County Counselor's Office and as a legal assistant for a private attorney. (Tr. 51). Her work duties as a legal assistant included scheduling appointments, updating files, and having initial contact with clients. As an office assistant, she scheduled hearings, typed subpoenas and filed documents. Plaintiff testified that she had stopped working in 2012 because she was unable to get her diabetes under control. At the hearing, the ALJ noted that plaintiff only seemed to be able to sit for about five minutes at a time. (Tr. 52–53). Plaintiff stated that she had radiating pain from her back down through her leg to her big toe. Hydrocodone helped manage the pain when the pain reached a point where she could no longer take it. The pain never completely went away. (Tr. 54).

In response to questioning from the ALJ, plaintiff stated that she could walk for 10–15 minutes before she needed a rest. She could dress herself, except for putting on her shoes. However, plaintiff stated that she usually stayed in her pajamas all day. She could not wear jeans or anything tight that put pressure on her back. Plaintiff testified that she was able to do some household chores, but it took her 3–4 times longer to complete the chores than she thought it should. She could not sweep or mop and she cooked in stages. Her husband helped out at home frequently.

After arising on a typical day, plaintiff checked her blood sugar, ate something, took her medicine, did stretching exercises, and took a nap. (Tr. 54). After her nap, she usually started dinner or spent some time on a computer. (Tr.

55).  The ALJ noted that plaintiff had asked her son to come with her to the hearing to help her read.  Plaintiff testified that her diabetes affected her vision and she owned four different pairs of glasses depending on what her eyesight was like on a particular day.  She stated that every day there was some sort of change in her vision.  Plaintiff described her social life as "absolutely nothing."  (Tr. 56).  Her grandchildren visited her at her house on occasion, but she frequently felt tired and slept.

Besides the pain in her lower back, plaintiff testified that she also had pain in her right elbow, wrist, knee and shoulder where she had rotator cuff surgery.  She stated that she had had a total of 9–10 surgeries in the past and had scar tissue throughout her body.  She was scheduled to see a rheumatologist in a month.  Plaintiff also told the ALJ to consider her work history and note that this was the first time in her life that she had not worked.  (Tr. 57).  Her ultimate goal was to return to work, because she did not like staying at home.  Plaintiff was depressed by the fact that she could no longer go on yearly vacations.  Friends no longer called her to go out, she stated, because they knew she could not go.

Plaintiff further stated that treating physicians did not want to touch her back because of her infection.  (Tr. 58).  She said that she had been on a PICC line for 15 weeks to try to clear the infection.  Her body had shut down from the amount of antibiotics she was on and she was admitted to the hospital.  Plaintiff stated that she also had "horrible headaches from the nerve endings in [her] head."  (Tr. 59).  Additionally, plaintiff took medication for depression and stated that depression contributed to her inability to work.  (Tr. 60, 62).  Plaintiff had neuropathy in both feet from her diabetes.  (Tr. 63).  Plaintiff reported falling twice, tearing her rotator

cuff the first time and knocking her teeth out the second time. (Tr. 61). She testified that she now wore dentures. At the completion of plaintiff's testimony, the ALJ stated that he would order psychological and neurological consultative examinations. (Tr. 63–66).

On July 3, 2014, J. Stephen Dolan, a vocational expert, responded to interrogatories from the ALJ. The interrogatories requested Mr. Dolan's opinion regarding employment opportunities for an individual of plaintiff's age, education, work experience, and the residual functional capacity to perform sedentary work, except that the individual was unable to climb ramps, stairs, ladders, ropes or scaffolds, kneel, crouch and crawl, but could occasionally stoop, was able to push or pull with her upper extremities on an occasional basis only, was unable to operate any foot control operations, should avoid concentrated exposure to extreme vibration and all operational control of moving machinery, working at unprotected heights, and the use of hazardous machinery, and could only engage in simple, routine and repetitive tasks, with a low stress job defined as requiring only occasional decision making and only occasional changes in the work setting. (Tr. 273–80).

Mr. Dolan first identified plaintiff's past work experience as an administrative clerk, legal secretary, training manager, and informal waitress. (Tr. 279). The vocational expert then opined that the hypothetical individual posed could not perform any of plaintiff's past jobs, because the past work was not simple, routine and repetitive. However, Mr. Dolan wrote that such an individual could perform the unskilled occupations of a cashier at the light exertional level, or a sedentary assembler or product checker. (Tr. 280).

With respect to the interrogatories, plaintiff wrote that Mr. Dolan did not have enough facts to allow him to make an informed decision. (Tr. 283–84). Specifically, plaintiff stated that she could not sit or stand for more than 20–30 minutes without changing positions, the medications she took on a daily basis had side effects that made her drowsy and dizzy, antibiotics she took for her back made her blood sugar levels fluctuate considerably, her SED rate and C-reactive protein levels were still very high, and her primary care physician, Jennifer Wessels, M.D. agreed that plaintiff could not do the job description listed by the vocational expert. With her response, plaintiff included a letter from Dr. Wessels stating that plaintiff had multiple chronic medical conditions that caused her chronic pain and difficulty walking and standing for more than 20 minutes at a time. (Tr. 296). The doctor stated that plaintiff's medication regimen often caused her side effects such as drowsiness and fatigue.

### C.  Medical Records

On March 15, 2010, plaintiff had a head CT scan and an MRI of her brain at Mercy Hospital to assess her visual problems and elevated sedimentation rate. (Tr. 401). Neither test showed acute or significant intracranial abnormality. The MRI confirmed very focal minimal right frontal white matter changes at the right frontal horn, but further clinical correlation was noted as necessary for assessment. Plaintiff's medical records resume on March 11, 2011 with an appointment with Philip G. Conway, M.D. at Dunn Physician Offices for leg pain. (Tr. 297–302). Plaintiff was noted to be a passive smoker, consuming half a pack of cigarettes a day for fifteen years. It was also noted that sometime last fall plaintiff was nearly struck by a car and injured her calf when she jumped out of the car's way. She had

gone to the emergency room and was told that her injury was muscular. Since that time it had healed with mild sensitivity in the area, until she began to walk more recently. The pain was uncomfortable primarily at rest rather than ambulation. Dr. Conway also thought the injury was muscular, but he had some concern for clotting and sent her for a venous Doppler examination. The venous Doppler exam found no evidence of deep or superficial vein thrombosis in the left lower extremity. (Tr. 361). Because her injury was determined to be muscular, Dr. Conway advised plaintiff to use heat, rest, and anti-inflammatory to treat the injury.

Plaintiff returned to see Dr. Conway on May 18, 2011 (Tr. 303–08), reporting significant increased left leg heaviness in the past few weeks. The doctor noted that this seemed to be a continuation of the issue for which she underwent a negative venous Doppler in March. Her sugar levels also had jumped markedly over the past several days. Upon physical examination, plaintiff appeared mildly ill, had inflamed nasal membranes and her leg demonstrated tenderness along the lateral medial aspects of the calf. Dr. Conway diagnosed plaintiff with lower leg joint pain and uncontrolled diabetes mellitus type II. Plaintiff was first diagnosed with diabetes at age 45. (Tr. 932). Dr. Conway still felt plaintiff's leg injury was a muscular skeletal issue. He instructed plaintiff to use a scheduled anti-inflammatory and to call if her injury did not improve. Dr. Conway also added samples of Januvia[18] for plaintiff's diabetic control and indicated he would make further adjustments to her sugars if needed.

---

[18] Januvia, the brand name for Sitagliptin, is used with diet and exercise to lower blood sugar levels in patients with type 2 diabetes. https://www.nlm.nih.gov/medlineplus/druginfo/meds/a606023.html (last visited August 24, 2015).

On September 29, 2011, plaintiff was treated by Eileen McKeon, A.P.R.N. for diarrhea and blood sugar problems. Plaintiff had recently started Metformin for management of her diabetes after limited success with Januvia and Amaryl. She was aware that diarrhea was a side effect for Metformin. Plaintiff was advised to take Metformin at night with dinner. Plaintiff reported that she sometimes had right upper quadrant pain, vision changes, and some tingling sensation to her feet and fingers. She was unhappy with her blood sugar control and felt tired all of the time. Nurse McKeon provided or reinforced diabetic education with plaintiff, including diet, healthy lifestyle choices, water, limited caffeine intake, foot care, and eye exams. The nurse also ordered lab testing for plaintiff's reported right upper quadrant pain and advised plaintiff to follow up in three months.

Plaintiff returned to Dr. Conway's office on November 23, 2011 with complaints of back pain. (Tr. 319–23). She began having pain in her mid-back after carrying 18 chairs up and down stairs. Her neck also had mild symptoms. Plaintiff had been using an anti-inflammatory and ice with limited relief. Objective examination indicated tenderness along the musculature in her back, as well as the spine. There was no significant pain on rotation, but some pain on stretching. Dr. Conway diagnosed plaintiff with back strain and advised rest, heat, a muscle relaxer, and pain medication. If her symptoms did not improve in a week, the doctor would suggest thoracic spine x-rays. Dr. Conway wrote plaintiff prescriptions for Hydrocodone-Acetaminophen 5-500 mg and Flexeril 10 mg.

On December 30, 2011, plaintiff visited Dr. Conway's office for upper respiratory symptoms. (Tr. 324–29). Plaintiff reported that she had had a knot in her neck for four days with a sore throat. She also reported a persistent cough,

occasional wheezing, and mild dyspnea. Plaintiff had been given Zithromax two days ago with mild improvement. Dr. Conway diagnosed plaintiff with acute sinusitis and a cough. The doctor ordered her to take Phenergan[19] with codeine for her congestion and return if her symptoms worsened or failed to improve.

Plaintiff went to the emergency room at DePaul Health Center on January 4, 2012 for a five-hour visit. (Tr. 407–30). She reported a 2–3 day headache that was mild at first but had progressively worsened. The headache was localized to the right temporal area with a reported severity of 9 on a 10-point scale. Plaintiff also complained of blurry vision in her right eye and mild nausea. Plaintiff's hospital course included tests of her C-reactive protein, sedimentation rate, meningitis, pulse oximetry, comprehensive metabolic panel, complete blood count, urinalysis, and a CT scan of her head. Her physical and funduscopic examinations were normal, but her sedimentation rate was elevated. The emergency care physician discussed these results with an ophthalmologist and Dr. Conway and advised plaintiff to follow up with these doctors. Plaintiff was diagnosed with a headache. She was given two doses of morphine in the hospital and prescribed a Medrol dose pack[20] and Vicodin on discharge.

Plaintiff returned to the emergency room the next day, complaining of cramping, burning, and tight pain on the left side of her abdomen that began last night after her discharge from the hospital. (Tr. 431–53). Plaintiff stated that she

---

[19] Phenergan, or Promethazine, is used to relieve the symptoms of allergic reactions such as allergic rhinitis (runny nose and watery eyes caused by allergy to pollen, mold or dust), allergic conjunctivitis (red, watery eyes caused by allergies), allergic skin reactions, and allergic reactions to blood or plasma products. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682284.html (last visited on Mar. 11, 2011).

[20] Medrol is the brand name for methylprednisolone, a corticosteroid, prescribed to relive inflammation. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682795

had taken Vicodin last night and it had helped with her pain. She was given two doses of Dilaudid[21] for the pain in the hospital. Plaintiff's physical examination and EKG were normal. Her labs and CT scan of her abdomen were also negative. The emergency care physician diagnosed plaintiff with acute abdominal pain and instructed her to be discharged.

On January 6, 2012, plaintiff had a follow-up appointment with her primary care physician, Dr. Conway. (Tr. 330–35). Plaintiff continued having some abdominal pain, nausea, and a lack of appetite since her emergency room visits. She also continued to have pain in her right scalp and some visual blurring bilaterally, which she attributed to her high sugar levels. Dr. Conway diagnosed plaintiff with abdominal pain, a headache, and uncontrolled diabetes mellitus. The doctor noted that plaintiff needed insulin management and fluids to control her blood sugar levels. The doctor was concerned about plaintiff's right temporal pain, since she had been on steroids for almost 48 hours. Dr. Conway recommended plaintiff for direct admission to Mercy Hospital for symptom control and planned to arrange a temporal artery biopsy.

Plaintiff was admitted to Mercy Hospital for testing and treatment for six days. (Tr. 371–91). Throughout her hospitalization, she was found to have an elevated sedimentation rate. The treating physicians thought plaintiff most likely had a migraine headache, but agreed that temporal arteritis could not be ignored. Her temporal artery biopsy was negative. Plaintiff also had radiology testing for her left upper quadrant pain. The x-ray of her abdomen showed no obstruction and the

.html (last visited on July 29, 2011).

CT scan and ultrasound of her abdomen identified no acute intra-abdominal abnormality. Her lab tests only showed a minimal elevation of her AST and ALT that had been present for at least six months. Fred H. Williams, M.D. thought plaintiff's pain was probably chronic and functional in nature, and possibly exacerbated by her recent upper respiratory infection.

On January 19, 2012, plaintiff had a follow-up visit with Dr. Conway after her hospital stay. (Tr. 348–55). After the negative temporal artery biopsy and neurologic consultation, it was thought that plaintiff's headaches were migraine in origin. Since then plaintiff reported some good relief with Imitrex.[22] She was frustrated, however, by her continued high sugars. On physical examination, Dr. Conway noted that plaintiff had a nicely healing incision on her temple and no evidence of infection around the sutures. The doctor diagnosed plaintiff with uncontrolled diabetes mellitus and provided her with a Humalog[23] pen and written sliding scale for controlling her sugars. Her migraine headaches were now under acceptable control. Plaintiff was instructed to call Dr. Conway next week with an update as to her sugar levels and overall status.

Plaintiff returned to Dr. Conway's office for suture removal and her blood sugar problem on January 31, 2012. (Tr. 356–60). Plaintiff reported that she still felt very tired and her sugars had not been well-controlled. She had been having some sweats and leg cramps at night. Her headaches also had continued at a

---

[21] Dilaudid is a hydrogenated ketone of morphine indicated for management of pain. Phys. Desk. Ref. 2873-74 (65th ed. 2011).
[22] Imitrex, the brand name for Sumatriptan, is a selective serotonin receptor agonist used to treat the symptoms of migraine headaches.
https://www.nlm.nih.gov/medlineplus/druginfo/meds/a601116.html (last visited August 24, 2015).

milder level.   Dr. Conway believed her symptoms were the result of uncontrolled diabetes and instructed her to begin using 20 units of Lantus[4] Solostar daily.

On February 16, 2012, plaintiff had a neurology consultation with Maheen Malik, M.D. per Dr. Conway's reference.   (Tr. 503–04, 506–08).   Plaintiff told Dr. Malik that her headaches had started three years earlier and the blurred vision in her right eye had started when her headaches had increased in January.   Plaintiff reported that Imitrex had helped substantially with pain, but made her sleepy.   She expressed frustration and felt overwhelmed by her medical issues.   Her mental status, motor and reflex examinations were all normal.   Per her sensory exam, plaintiff had some decrease in light touch and pinprick sensation in the lower extremities to just above the ankles bilaterally, in addition to hyperesthesia over the dorsum of the feet and toes.   Dr. Malik diagnosed plaintiff with migraines and diabetic neuropathy.   Plaintiff was encouraged to keep a headache diary and was given prescriptions for Imitrex and Viibryd.[24]

On February 20, 2012, plaintiff had an appointment with a podiatrist, Samuel T. Wood, D.P.M.   (Tr. 466–67).   Plaintiff complained of burning, tingling paresthesia-type problems to the tips of both toes and the bottom of both feet. She also complained of pain to the lateral aspect of the right foot and ankle around the subtalar joint.   These problems had developed six months ago and worsened over the last two months.   Walking and wearing ill-fitting shoes aggravated the pain.   Upon physical exam, the range of motion of her ankle, subtalar and mid-

---

[23] Humalog, the brand name for insulin lispro, is an artificial insulin used to treat patients with type 2 diabetes who need insulin to control their diabetes.
https://www.nlm.nih.gov/medlineplus/druginfo/meds/a697021.html (last visited August 24, 2015).

tarsal joints was normal without any pain or crepitus on the right foot.  On the left foot, she had pain to the periphery of the fifth metacarpophalangeal joint dorsally and laterally.  An x-ray exam showed spurring to the plantar fascia insertion and Achilles tendon.  Dr. Wood assessed plaintiff with symptomatic probable diabetic neuropathy of both feet, arthritis of the right subtalar joint, and possible symptomatic tailor's bunion.  The doctor ordered an EMG nerve conduction to evaluate plaintiff's neuropathy, provided an injection of lidocaine and Kenalog[25] for her subtalar right joint, instructed plaintiff to wear wide, padded shoes for her bunion, and asked her to follow up in two weeks to see how the injection worked. Based on the EMG nerve conduction study of plaintiff's feet, Duane Turpin, D.O. diagnosed plaintiff with peripheral polyneuropathy.  (Tr. 454–58, 468–69).  Dr. Turpin noted that the findings were mild and primarily sensory in nature.

Plaintiff sought mental health care from Psych Care Consultants on February 26, 2012.  (Tr. 513).  Plaintiff reported poor sleep and intrusive thoughts of family abuse.  Her depression had worsened gradually since December 2011.  Plaintiff's prescribed dosage of Viibryd was decreased and Remeron[26] was added to her regimen.  At her follow-up appointment with Dr. Wood on March 5, 2012, plaintiff stated that her right foot was doing much better since the injection Dr. Wood gave her.  (Tr. 465).  Dr. Wood noted that plaintiff's EMG had shown mild and primarily

[24] Viibryd, the brand name for Vilazodone, is a selective serotonin reuptake inhibitor used to treat depression by increasing the amount of serotonin in the brain.
https://www.nlm.nih.gov/medlineplus/druginfo/meds/a611020.html (last visited August 24, 2015).
[25] Kenalog, the brand name for Triamcinolone, is a corticosteroid with anti-inflammatory action.
https://www.nlm.nih.gov/medlineplus/druginfo/meds/a601124.html (last visited August 24, 2015).
[26] Remeron, or Mirtazapine, is prescribed for the treatment of depression.
http://en.wikipedia.org/wiki/Mirtazapine.

sensory findings of neuropathy. The doctor increased her dosage of Neurontin[27] and instructed her to follow up in three weeks.

Plaintiff was referred to Dana N. Brantley, N.P. at Saint Charles Clinic Medical Group on March 14, 2012 for diabetic control. (Tr. 477–79). The nurse practitioner noted that plaintiff did not comply with her prescribed diet, exercise, or medications and her blood sugar continued to be uncontrolled. Her weight had increased steadily and she complained of blurred vision. Plaintiff stated that she had formerly smoked, but quit on November 21, 2011. The nurse practitioner increased plaintiff's Lantus insulin, Humalog, Amaryl and Metformin to treat her diabetes. Plaintiff was instructed to monitor and call in her blood sugar numbers once a week for review. The nurse practitioner also discussed with plaintiff the risk factors associated with diabetes and encouraged her to diet and exercise. At an appointment with Dr. Malik the next day, it was noted that plaintiff's sugars were finally starting to improve. (Tr. 505).

Plaintiff returned to Dr. Conway's office on April 3, 2012 for a shoulder injury caused by a fall in February. (Tr. 489–94). Her discomfort had systematically worsened last Thursday when she ran into a cabinet. Her shoulder was comfortable at rest, but uncomfortable with pressure and movement. She also told Dr. Conway that her headaches were still present to a significant degree. Her blood sugars had been under much better control. Upon objective examination, plaintiff's shoulder demonstrated tenderness laterally and posteriorly with significant discomfort on internal rotation. Dr. Conway suspected a rotator cuff injury and prescribed

---

[27] Neurontin is used to help control certain types of seizures in people with epilepsy and to relieve the pain of postherpetic neuralgia, the pain or aches that may occur after attack of shingles. It is also

plaintiff Lortab 5-500 mg as needed for pain. An x-ray of her right shoulder was ordered.

At her appointment with Dr. Malik on May 24, 2012, plaintiff stated that her headaches were less in frequency, down to one or two a week. (Tr. 510). Her neuropathy caused her to feel like she had pins and needles in her lower legs. She did not tolerate Topamax[28] and had stopped taking it. Her depression also had not improved with Viibryd. Plaintiff was crying, crabby, and felt apathetic. Dr. Malik added Cymbalta[5] 60 mg to plaintiff's medication regimen and instructed her to follow up in one month. At a psychosocial evaluation with JoAnn Shrew, R.N. at Psych Care Consultants on July 17, 2012 (Tr. 514–16), plaintiff stated that she felt isolated, had decreased activities of daily living, was unable to work, was forgetful, slept poorly, had low energy, had a poor appetite, and experienced chronic pain. She had had flashbacks of her stepfather sexually abusing her and all four of her siblings. Plaintiff had started smoking cigarettes again on March 12th. Upon examination, the nurse noted that plaintiff appeared well-groomed, cooperative, tearful, depressed, anxious, oriented and had fair concentration. She diagnosed plaintiff with a mood disorder and post-traumatic stress disorder. Nurse Shew

---

prescribed to treat restless legs syndrome, diabetic neuropathy, and hot flashes.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a694007.html (last visited on January 29, 2015).
[28] Topiramate, brand name Topamax, is an anticonvulsant that is used to prevent migraine headache but not to relieve the pain of migraines when they occur.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a697012.html (last visited on Jan. 13, 2015).

assigned plaintiff a Global Assessment of Functioning (GAF) score of 30,[29] added Seroquel[30] 50 mg to plaintiff's treatment plan and advised weekly therapy.

A lumbar spine radiograph to assess plaintiff's low back pain on December 4, 2012 showed early anterior longitudinal ligament ossification from L1 to L4, but was otherwise normal. (Tr. 521, 582). A lumbar spine MRI on December 12, 2012 showed minimal degenerative changes of the lumbar spine. (Tr. 522, 583–86). Specifically, at L5-S1 plaintiff had a mild bulging disc that was more severe on the left side and mild left neural foraminal narrowing with no facet arthropathy and no central canal stenosis. Plaintiff was examined at the Breakthrough Pain Relief Clinic on February 20, 2013 for low back and left leg pain. (Tr. 524–25). Standing in the same position or sleeping on her left side made the pain feel worse. Pain medicine and changing positions made her feel better. An examination showed nerve irritation and possible nerve damage contributing to her pain. The clinic recommended twelve rehabilitation visits to treat plaintiff's spine. A lumbar spine MRI on March 8, 2013 showed mild degenerative changes of the lumbar spine with no compression of the conus or cauda equine. (Tr. 587–89).

Dr. Wessels referred plaintiff to Peter K. Yoon, M.D. for a neurosurgical evaluation of plaintiff's low back pain on March 25, 2013. (Tr. 533–37). Plaintiff stated that the pain had developed gradually approximately four months ago, had an aching, dull, and sharp quality, and radiated into the left L5 and posterior leg into the dorsum of the foot distribution. The pain waxed and waned in severity

---

[29] A GAF of 21-30 corresponds with "[b]ehavior . . . considerably influenced by delusions or hallucinations OR serious impairment in communications or judgment OR inability to function in all areas." American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 32-33 (4th ed. 2000).

throughout the day.  It was aggravated by bending, lifting and sitting.  Physical therapy and epidural steroids were ineffective in alleviating the pain.  Dr. Yoon reviewed plaintiff's radiology reports and images.  Upon physical examination, plaintiff had a normal spinal range of motion, normal paraspinal muscle strength and tone, and no joint or limb tenderness to touch in her lower extremities.  She had some weakness on the left with a straight leg raising test.  Her neurologic and mental examinations were normal.  Dr. Yoon assessed plaintiff with lumbosacral radiculopathy.  The doctor thought her symptoms were most consistent with L5 radiculopathy, but he noted that her MRI did not show any significant pathology to account for this finding.  Dr. Yoon ordered a lumbar myelography to see if that would reveal any significant pathology to account for plaintiff's pain.  The lumbar myelogram was radiographically normal.  (Tr. 539–40, 591–92).  A post-myelogram CT of plaintiff's lumbar spine, however, showed left foraminal and lateral L5-S1 disc herniation, disc bulge, and lumbar spondylosis.  (Tr. 538, 590).

Dr. Yoon performed a far lateral transfacetal discectomy at L5-S1 for plaintiff's disc herniation at Mercy Hospital on April 16, 2013.  (Tr. 549).  A week after the operation, she had her wound checked by Dr. Yoon.  (Tr. 550–51).  Plaintiff stated that two or three days earlier she felt a pop and had drainage.  At that time she had generalized muscle aches, particularly in the posterior neck.  Dr. Yoon looked at her incision and noticed irritation from the bandages.  The doctor thought seroma was the most likely clause.  He cleaned the wound and diagnosed it as an uncomplicated skin infection.  Plaintiff did not want lab work and opted to be

---

[30] Seroquel is indicated for the treatment of acute manic episodes associated with bipolar I disorder and schizophrenia.  See Phys. Desk Ref. 691 (61st ed. 2007).

placed on an empiric antibiotic for a week. Plaintiff was educated on symptoms of infection and told to record her temperatures and call if she had a fever.

Dr. Wessels referred plaintiff to see Heidi Prather, D.O. at Washington University Orthopedics on July 24, 2013. (Tr. 1004–06, 1041–43). Plaintiff alternated between sitting and standing throughout the appointment. She was uncomfortable and tearful during the examination. Upon physical examination, plaintiff had pain with flexion and extension, with her side bending limited to the right as compared to the left. She had full strength. Plaintiff also had pain with internal and external rotation on either side of her back. Dr. Prather was unable to do the active straight leg raise test because of plaintiff's pain. Dr. Prather diagnosed plaintiff with low back pain, status post-discectomy, and left L5 radicular pain. The doctor wanted plaintiff to have blood work to ensure her sedimentation and C-reactive protein levels were not low and prescribed plaintiff Meloxicam.[11]

A lumbar spine MRI from Barnes Jewish Hospital on July 25, 2013 showed mild degenerative changes of the lumbar spine with multilevel degenerative disc disease at L1-L2, L4-L5 and L5-S1. (Tr. 979–80, 1046–48). Also, the MRI showed interval development of edema within the left posterior paraspinal tissues at the L4-S1 levels, which possibly was secondary to interval rupture of the previously seen synovial cyst emanating posteriorly from the L4-L5 facet joint, represented active synovitis of the L4-L5 facet joint, or alternatively was related to change from recent interventional therapy such as facets or epidural injections. A lumbar spine MRI on August 2, 2013 showed mild degenerative changes of the lumbar spine with multilevel degenerative disc disease at L1-L2, L4-L5, and L5-S1. (Tr. 593–95, 1044–45). The previously visualized edema in the left posterior paraspinal tissues

at the L4-S1 levels was unchanged compared to the July 25th exam. The region demonstrated diffuse intense enhancement in the left epidural space medial of the left facet. It was noted that this most likely represented an inflammatory reaction without definable abscess or discitis.

At her appointment with Dr. Prather on August 12, 2013, the doctor noted that plaintiff's repeat MRI examinations showed diffuse edema in the paraspinal tissues and epidural space. (Tr. 1040). Dr. Prather discussed these results with Dr. Buchowski and two other members of the infectious disease team who agreed to admit her to the hospital for IV antibiotics and possible aspiration. Plaintiff consented and proceeded to direct admission. Upon admission to Barnes Jewish Hospital, Jeffrey Lynn Gum, M.D. noted that plaintiff was admitted to the hospital with a failed discectomy and concern for discitis. (Tr. 596–97). A portable AP radiograph of plaintiff's chest showed placement of a right peripherally inserted central venous catheter (PICC) and small lung volumes that were otherwise clear. The cardiomediastinal silhouette was normal.

On discharge from the hospital the next day, plaintiff's diagnosis was discitis. (Tr. 619–25). Her prescription medications at that time included: Acetaminophen-Oxycodone[31] 325 mg-5 mg every four hours as needed for pain; Cefepime[32] 2 g injection every 12 hours for a bone infection; Cholecalciferol 2000 units every day for a vitamin D deficiency; Cymbalta 60 mg every day for depression; Diazepam[33] 5

---

[31] Oxycodone Acetaminophen is also known as Percocet. Oxycodone is an opioid analgesic indicated for relief of moderate to moderately severe pain. It can produce drug dependence. See Phys. Desk. Ref. 1114 (60th ed. 2006).

[32] Cefepime is an antibiotic used to treat infection. https://www.nlm.nih.gov/medlineplus/druginfo/meds/a698021.html (last visited August 24, 2015).

[33] Diazepam is used to relieve anxiety, muscle spasms, and seizures and to control agitation caused by alcohol withdrawal. http://www.nlm.nih.gov/medlineplus

mg every six hours for muscle spasms; Divigel 0.25 mg once a day as an estrogen supplement; Flexeril 10 mg every eight hours for spasms; Gabapentin[34] 300 mg three tablets three times a day for pain; Hepann Flush 10 units/mL, 5 mL every 12 hours for flushing plaintiff's PICC line; Humalog 100 units/mL, 8 units with meals for high blood sugar; Humalog sliding scale; Hydroxyzine[10] Hydrochloride 25 mg every 4–6 hours as needed for pain; Insulin Glargine 100 units/mL, 26 units once a day for high blood sugar; Meloxicam 15 mg orally once a day for pain; Metformin 1000 mg once a day for diabetes; Protonix[2] 40 mg once a day for GERD; Senna S 50 mg-8.6 tablets twice a day for constipation; Sodium Chloride 0.9% irrigation, 10-80 mL IV push every 8 hours for flushing the central line; Vancomycin[35] 1 g every 12 hours for bone infection; and Zolpidem[12] 5 mg orally once a day for sleep aid.  Plaintiff would have in-home care for the next six weeks, including routine lab testing once or twice a week.

From August 14, 2013 to September 1, 2013, plaintiff had ten visits from BJC Home Care Services nurses to treat her discitis.  (Tr. 660–76, 776–40, 859–60). She was on IV antibiotics for the infection via a PICC line.  At each visit, the nurses took notes of plaintiff's subjective reports of lower back pain and assessed plaintiff's mental and physical status.  The nurses ensured that plaintiff's PICC line was properly attached, flushed, and cleaned, and that her family understood how to administer antibiotics.  On several occasions, the nurses noted that plaintiff did not

---

/druginfo/meds/a682047.html (last visited on Mar. 9, 2011).
[34] Gabapentin is used to help control seizures, to relieve the pain of postherpetic neuralgia, and restless leg syndrome.  http://www.nlm.nih.gov/medlineplus/druginfo /meds/a694007.html (last visited on Sept. 1, 2011).
[35] Vancomycin is a glycopeptide antibiotic used to treat intestinal inflammation that may occur after antibiotic treatment.  https://www.nlm.nih.gov/medlineplus/druginfo/meds/a604038.html (last visited August 24, 2015).

consistently check her blood sugars in the morning as advised.  (Tr. 794, 802, 810, 829).  Timothy J. Koboldt, M.D. requested an MRI and radiography of plaintiff's lumbar spine on August 31, 2013.  (Tr. 554–56, 557, 598–99).  The MRI showed a slight interval decrease in edema along the left paraspinal musculature posteriorly at L5-S1 with no evidence of discitis or epidural fluid infection.  It was noted that this likely represented sequela of the prior ruptured synovial cyst.  The MRI also showed mild, stable degenerative disc disease.  The frontal, lateral radiography similar showed mild degenerative disc disease at L4-L5.

On September 1, 2013, plaintiff was transferred to an in-patient facility at Barnes Jewish Hospital for a PICC line infection.  (Tr. 841).  A new PICC line was placed in plaintiff's upper arm.  (Tr. 626–32).  After her discharge on September 4, 2013, plaintiff had thirteen more home visits from BJC Home Care Services nurses with regular lab testing to monitor the administration of IV antibiotics for her infection.  (Tr. 677–75).  The nurses routinely noted that pain medication controlled or alleviated plaintiff's back and abdomen pain.  (Tr. 678, 685, 693, 701, 709, 723, 731, 738, 753, 761, 769)  A microbiology report was negative for Clostridium difficile[36] toxin on September 16, 2013.  (Tr. 868, 910).  By October 17, 2013 plaintiff's back incision had healed and she had completed her IV antibiotics.  Her PICC line was pulled and she was discontinued from home care services.  (Tr. 677–83, 853).  The antibiotics plaintiff was administered for spinal infection alternated from Vancomycin and Cefepime to Daptomycin and Meropenem to Clindamycin and Ciprofloxacin for a total of nine weeks of antibiotics.  (Tr. 932).

---

[36] Clostridium difficile is a bacterium that causes diarrhea and more serious intestinal conditions such as colitis.  https://www.nlm.nih.gov/medlineplus/clostridiumdifficileinfections.html (last visited August 24, 2015).

A CT exam of plaintiff's abdomen and pelvis on October 31, 2013 showed liquid contents within the colon in keeping with plaintiff's given history of diarrhea. (Tr. 563–64, 600–01). The CT scan did not show evidence of colitis (large intestinal inflammation), abscess, or other acute pathology within the abdomen or pelvis. Diffuse hepatic steatosis (fatty liver) was also shown. A lumbar spine MRI on November 1, 2013 showed minimal unchanged degenerative changes of the lumbar spine in comparison to plaintiff's August 31st MRI. (Tr. 566–67, 602–03). The MRI further showed slight interval improvement of paraspinal edema and no abscess. Discharge instructions from Barnes Jewish Hospital on November 3, 2013 indicated that plaintiff had been diagnosed with diarrhea and abdominal pain that was presumed Clostridium difficile colitis. (Tr. 568–72, 633–37).

On December 2, 2013, plaintiff told Dr. Prather that she was still having quite a bit of back pain. (Tr. 1039). Her sedimentation and C-reactive protein levels had also been high. Dr. Prather noted that plaintiff had recently been treated for gastrointestinal gastritis and it was thought plaintiff had Clostridium difficile, but plaintiff never cultured positive for the bacteria. Surgery had not been recommended. A repeat MRI still showed edema, but no fluid match. There was no active edema found within the disc itself. Dr. Prather noted that plaintiff could not sit still and shifted or unloaded her weight in the office chair. Dr. Prather assessed plaintiff with low back pain, lumbar radiculopathy with a history of infection. Plaintiff had maxed out on all of her medications, so Dr. Prather wanted to follow up with her after she had seen a gastroenterologist. At her follow-up appointment with Dr. Prather on December 18, 2013, the doctor informed plaintiff that the studies were normal and had no electrodiagnostic findings of peripheral

neuropathy or lumbar radiculopathy. (Tr. 1037). Dr. Prather planned to re-route plaintiff back to the infectious disease team, since she could not treat plaintiff in the orthopedic department with a high sedimentation rate.

A lumbar spine MRI conducted on December 26, 2013 re-demonstrated post-operative changes of prior left L5-S1 discectomy. (Tr. 604–06, 938–39). Also, the MRI showed mild progressive increase in left L5 vertebral body enhancement and edema with concomitant decrease in left paraspinal enhancement and edema. The resulting report noted that this probably represented an inflammatory postoperative scarring process, including endplate changes related to progressive L5-S1 disc degeneration. An indolent infection was less likely given the progressive spontaneous improvement in left paraspinal enhancement and edema.

In physician discharge notes from Richard D. Brasington, Jr., M.D. at Barnes Jewish Hospital on December 27, 2013, it was noted that plaintiff's back pain had initially improved after her antibiotic cycle with in-home care service, but the pain had recurred in the past month. (Tr. 932–37, 638–42, 940–43). The pain was in the left side of her lower back, central in origin, and radiated down her left leg. She reported that Vicodin helped the pain, but only numbed it. Plaintiff also complained of mild right upper quadrant abdominal pain with nausea. Dr. Brasington found that plaintiff's abdominal pain was likely due to gastroenteritis rather than hyperglycemia and provided her Compazine[37] for nausea. The doctor continued plaintiff on Viibryd for her depression, Lantus for her diabetes, and Vicodin and Gabapentin for her back pain. The lesion seen on the MRI from December 26th was

biopsied. (Tr. 949–53). The diagnosis was marrow fibrosis with no evidence of osteomyelitis. (Tr. 954–55).

At a follow-up appointment with Dr. Prather on January 23, 2014 (Tr. 1036), plaintiff had pain with forward flexion and slump sit. Dr. Prather reviewed plaintiff's last MRI, which she noted showed marked resolution of edema in the paraspinal muscles. Dr. Prather discussed doing an S1 nerve block without steroids with plaintiff. She also switched plaintiff from Gabapentin to Lyrica[38] and put her back on Cymbalta 60 mg for better pain control.

On March 15, 2014, plaintiff had a consultative appointment with Vivian Knipp, Ph.D., a Missouri licensed psychologist. (Tr. 984–87). Dr. Knipp noted that plaintiff appeared to be a reliable and credible historian, although she had difficulty recalling exact dates of events at times. Plaintiff told Dr. Knipp that she had had significant mood problems since January 2012. She was treated with medication for depression and was in counseling from July 2012 to April 2014 with JoAnn Shew, R.N. Plaintiff felt the counseling was very helpful, but stopped going due to difficulty making it to appointments since her back surgery and due to her reported pain levels. Plaintiff admitted to smoking, but said she was trying to quit by using nicotine vapor. Dr. Knipp observed that plaintiff was adequately groomed, wore a back brace, walked slowly, and had difficulty sitting during the interview. Plaintiff stood and leaned forward on the desk for much of the evaluation and occasionally

---

[37] Prochlorperazine, also known as Compazine, is used to control severe nausea and vomiting and to treat the symptoms of schizophrenia and anxiety.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682116.html (last visited on Sept. 1, 2011).
[38] Lyrica, or Pregabalin, is an anticonvulsant indicated for the treatment of neuropathic pain and postherpetic neuralgia and for the management of fibromyalgia.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a605045.html (last visited on Mar. 9, 2011).

walked about the office. Plaintiff's responses to Dr. Knipp's questions were coherent, logical and responsive.

Plaintiff appeared anxious and depressed during the evaluation. She expressed feelings of loneliness, sadness, and anxiety. She described intrusive thoughts about past abuse and feelings of guilt about not being able to prevent the abuse to herself or her siblings. Plaintiff perseverated about her inability to work and do things at home for her family. As to her level of daily functioning, plaintiff reported that she was able to pay bills, cook, do household chores, and care for her personal needs. She was not able to lift or stand for long periods of time. She was sometimes able to go grocery shopping depending on her pain level. Plaintiff reported that she had many friends, but did not see them often due to not being able to get out and do things like she used to do. Plaintiff was concerned she would not be able to go back to work because of her medical conditions, although she expressed a desire to do so. At this time, her stress levels were very high and interfered with her concentration and ability to complete tasks in a timely manner. Plaintiff had had limited improvement with medication but felt counseling was very helpful for her mood. Dr. Knipp diagnosed plaintiff with moderate persistent depressive disorder with persistent major depressive episode and post-traumatic stress disorder for at least the past two years. The doctor noted that plaintiff had a complicated medical history and clear limitations in her activities at that time. Dr. Knipp opined that ongoing counseling would be beneficial for plaintiff and that her mood might improve if her medical conditions stabilized. However, at that time Dr. Knipp thought it unlikely plaintiff could maintain consistent employment.

Dr. Knipp also completed a Mental Medical Source Statement for plaintiff regarding her ability to do work-related activities after her consultative evaluation on March 15, 2014. (Tr. 988–90). Dr. Knipp opined that plaintiff had no restrictions in her abilities to understand, remember, and carry out simple instructions or make judgments on simple work-related decisions. Plaintiff had moderate restrictions on her abilities to understand, remember and carry out complex instructions, or make judgments on complex work-related decisions. Dr. Knipp based these conclusions on plaintiff's problems with sustained concentration, persistence and pace; specifically, Dr. Knipp noted that plaintiff had intrusive thoughts about abuse that resulted in episodes of anxiety and depression. Plaintiff's ability to interact appropriately with supervisors, co-workers and the public was not affected by her impairments. Dr. Knipp also opined that plaintiff was unable to sit for extended periods of time or stand for long periods of time without support, based on her observations of plaintiff during the evaluation that same day. Finally, Dr. Knipp stated that plaintiff's mental limitations were first present in at least January 2012.

Plaintiff also had a consultative neurology examination on March 15, 2014 with Riaz A. Naseer, M.D. (Tr. 992–94). Plaintiff reported that she had been experiencing pain in her whole body all the time at a level of 15 on a 10-point scale. Dr. Naseer observed that plaintiff came to the office walking independently but slowly, and had slight difficulties getting on and off the examination table. A motor examination revealed that plaintiff had normal strength and tone in her upper and lower extremities with no obvious wasting of the small or large muscles. She had a decreased range of motion in the right shoulder and on forward,

backward, and lateral bending. Sensory examination revealed decreased sensation distally in both lower extremities. Dr. Naseer's clinical impressions of plaintiff included diabetes mellitus, diabetic neuropathy, residual back pain despite surgery, and chronic pain syndrome diffuse in nature, constant, severe, and unresponsive to multiple medications.

Dr. Naseer also completed a Physical Medical Source Statement regarding plaintiff's ability to do work-related activities on March 15, 2014. (Tr. 998–1003). Dr. Naseer opined that plaintiff could frequently lift or carry up to 10 pounds, occasionally lift or carry up to 20 pounds, and never lift or carry over 20 pounds. Plaintiff could sit, stand or walk for up to one hour at a time without interruption in an 8-hour workday, for a total of six hours sitting, one hour standing and one hour walking. Plaintiff did not use a cane to ambulate and did not need one. With respect to the use of her hands, plaintiff could frequently reach, handle, finger and feel, and occasionally push or pull with either hand. As to her use of feet, plaintiff occasionally could operate foot controls with either foot. Plaintiff could never climb stairs, ramps, ladders, or scaffolds, balance, stoop, kneel, crouch, or crawl. With respect to environmental limitations, plaintiff could never tolerate unprotected heights or moving mechanical parts. She could occasionally operate a motor vehicle, and occasionally tolerate humidity, wetness, dust, odors, fumes, extreme cold or heat, and vibrations. Plaintiff needed to be in quiet environments. Finally, plaintiff could go shopping, travel without a companion for assistance, ambulate without an aid, use standard public transportation, climb a few steps at a reasonable pace with the use of a single hand rail, prepare a simple meal and feed

herself, care for her personal hygiene, and sort, handle or use files. However, she could not walk a block at a reasonable pace on rough or uneven surfaces.

On March 25, 2014, plaintiff was admitted to the emergency room at Barnes Jewish West County Hospital with several complaints. (Tr. 1016–19). Primarily, she complained of right upper quadrant pain that was spasm-like, lasted about a minute at a time, and subsided then returned. She stated that she had had similar symptoms when she had a gallstone. Plaintiff's second complaint was of a petechial rash on her right hand extending almost to the elbow. She had been using Bactrim and had improvement. Plaintiff also had some pain around her left eye, and her husband stated that the left side of plaintiff's face was dropped compared to normal. Finally, plaintiff reported that her blood sugars had been high recently. Upon physical examination, plaintiff did not appear to be in acute distress, but did have notable left-sided facial droop.

Martin Kerrigan, M.D. decided to treat plaintiff's reported abdominal pain as possible mild pancreatitis and give her aggressive IV fluids for symptomatic control. He would check plaintiff's ultrasound in the morning to see if there was evidence of filling defect or ductal dilatation. As to plaintiff's abnormal facial palsy, Dr. Kerrigan noted that her examination seemed to be most consistent with a lower motor neuron issue and Bell's palsy.[39] In the doctor's experience, this condition was more common in the diabetic population. The doctor planned to cautiously start plaintiff on Prednisone[40] and try to get ahead of things with insulin since she was still

---

[39] Bell's palsy is a cause of facial paralysis that most commonly occurs with persons who are pregnant, diabetic, or sick with a cold or flu. https://www.nlm.nih.gov/medlineplus/bellspalsy.html (last visited August 25, 2015).
[40] Prednisone is a corticosteroid used to treat the symptoms of low corticosteroid levels, in addition to certain types of arthritis, severe allergic reactions, multiple sclerosis, lupus and certain conditions that

markedly hyperglycemic.  The doctor would also check with plaintiff's neurologist to confirm his assessment.  With respect to plaintiff's diabetes and hyperglycemia, Dr. Kerrigan suspected that plaintiff was noncompliant with insulin even though she stated she was compliant.  For plaintiff's chronic back pain, the doctor would continue plaintiff on Cymbalta and Lyrica.  For her GERD, the doctor continued plaintiff on Pantoprazole.[2]  A CT head scan performed that day showed no acute intracranial process.  (Tr. 1031–32).

The next day in the hospital, plaintiff reported improvement in her symptoms from use of Prednisone.  (Tr. 1020–22).  By observation, she still had left facial weakness and was going to therapy for her facial muscles.  A limited abdominal sonogram that day showed a 6 millimeter stone in the common duct with resultant mild dilatation measuring 8 millimeters.  (Tr. 1033–34).  Plaintiff's final diagnoses upon discharge from the hospital on March 27, 2014 included impacted common bile duct stone, Bell's palsy, and uncontrolled diabetes mellitus.  (Tr. 1007–15).  Plaintiff's right upper quadrant abdominal pain was treated with Hydromorphone[41] and was improving.  The gastrointestinal team recommended outpatient endoscopic retrograde cholangiopancreatography (ERCP),[42] which was scheduled for the coming Monday with Dr. Azar.  Plaintiff's facial palsy was treated with Prednisone 60 mg for one week.  Dr. Rai from the neurology team agreed with this evaluation and felt that no other work-up was necessary at this point.  The hospital also gave

---

affect the lungs, skin, eyes, kidneys, blood, thyroid, stomach and intestines.
https://www.nlm.nih.gov/medlineplus/druginfo/meds/a601102.html (last visited August 25, 2015).
[41] Hydromorphone is an opiate analgesic used to relieve severe pain.
https://www.nlm.nih.gov/medlineplus/druginfo/meds/a682013.html (last visited August 25, 2015).
[42] An endoscopic retrograde cholangiopancreatography is a procedure that combines upper gastrointestinal endoscopy and x-rays to diagnose and treat problems of the bile and pancreatic

plaintiff artificial tears, and she felt her difficulty closing her eye was improving prior to discharge.

Dr. Kerrigan suspected that plaintiff's poorly controlled diabetes was in part related to noncompliance, and found that Dr. Wessels also was suspicious of that. When plaintiff was admitted to the emergency room, her blood sugar level was 414 and she was again placed on Lantus and NPH[43] to take along with Prednisone. With those medications, plaintiff's sugar level was better controlled. By discharge, her morning glucose level was 134, suggesting that her Lantus dose was probably fairly appropriate. Plaintiff was discharged on her regular medications and instructed to be compliant with them. She also was advised on a diabetic diet. A letter from Dr. Wessel's office on May 19, 2014 stated that plaintiff had had a very complex medical history with numerous complications over the past two years that had left her unable to work. (Tr. 1035).

### III. The ALJ's Decision

In the decision issued on July 28, 2014, the ALJ made the following findings:

1.    Plaintiff meets the insured status requirements of the Social Security Act through December 31, 2016.

2.    Plaintiff has not engaged in substantial gainful activity since December 30, 2011, the alleged onset date.

3.    Plaintiff has the following severe impairments: degenerative disc disease of the lumbar spine status post-laminectomy with radiculopathy; type II diabetes mellitus; diabetic peripheral

---

ducts. http://www.niddk.nih.gov/health-information/health-topics/diagnostic-tests/ercp/Pages/diagnostic-test.aspx (last visited August 25, 2015).
[43] NPH insulin, neutral protamine Hagedorn, is an intermediate-acting insulin used to help control blood sugar levels in patients with diabetes. https://en.wikipedia.org/wiki/NPH_insulin (last visited August 25, 2015).

neuropathy; obesity; depressive disorder; and post-traumatic stress disorder (PTSD).

4.      Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.      Plaintiff has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. 404.1567(a), with the following additional limitations:   she can occasionally stoop; cannot kneel, crouch, crawl, climb ramps or stairs, or climb ropes, ladders or scaffolds; can occasionally push or pull with the bilateral upper extremities; is unable to operate any foot control operations; must avoid concentrated exposure to extreme vibration; must avoid all operational control of moving machinery, working at unprotected heights, and use of hazardous machinery; and is limited to work that involves only simple, routine, and repetitive tasks in a low-stress job, defined as one requiring only occasional decision-making and only occasional changes in the work setting.

6.      Plaintiff is unable to perform any past relevant work.

7.      Plaintiff was born on October 26, 1964 and was 47 years old, which is defined as a younger individual age 45–49, on the alleged disability onset date.

8.      Plaintiff has at least a high school education and is able to communicate in English.

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that plaintiff is "not disabled," whether or not plaintiff has transferable job skills.

10.     Considering plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that plaintiff can perform.

11.     Plaintiff has not been under a disability, as defined in the Social Security Act, from December 30, 2011, through the date of the ALJ's decision.

(Tr. 7–40).

## IV.  Legal Standards

The Court must affirm the Commissioner's decision "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002) (quoting Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001)). If, after reviewing the record, the Court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Court must affirm the decision of the Commissioner. Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011) (quotations and citation omitted).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. § 423(a)(1)(D), (d)(1)(A); Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520; Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009). "Each step in the disability determination entails a separate analysis and legal standard." Lacroix v. Barnhart, 465 F.3d 881, 888 n.3 (8th Cir. 2006).

Steps one through three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment. Pate-Fires,

564 F.3d at 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to steps four and five. Id.

"Prior to step four, the ALJ must assess the claimant's residual functioning capacity ('RFC'), which is the most a claimant can do despite her limitations." Moore, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." Social Security Ruling (SSR) 96-8p, 1996 WL 374184, *2. "[A] claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of his limitations." Moore, 572 F.3d at 523 (quotation and citation omitted).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002). This evaluation requires that the ALJ consider "(1) the claimant's daily activities; (2) the duration, intensity, and frequency of the pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints." Buckner v. Astrue, 646 F.3d 549, 558 (8th Cir. 2011) (quotation and citation omitted). "Although 'an ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them,' the ALJ may find that

these allegations are not credible 'if there are inconsistencies in the evidence as a whole.'" Id. (quoting Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005)). After considering the seven factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000); Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether a claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). The burden at step four remains with the claimant to prove her RFC and establish that she cannot return to her past relevant work. Moore, 572 F.3d at 523; accord Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001). See also 20 C.F.R. § 404.1520(f).

If the claimant is prevented by her impairment from doing any other work, the ALJ will find the claimant to be disabled.

## V. **Discussion**

In her brief, plaintiff argues that the ALJ did not properly evaluate the severity of her spinal infection and rotator cuff, failed to provide adequate reasons for rejecting the contrary opinions of examining medical consultants, did not

provide sufficient weight to the opinion of her nurse practitioner, and failed to consider the effect of her spinal infection and rotator cuff on her ability to work in the RFC assessment.

## A. Plaintiff's Severe Impairments

The ALJ found that plaintiff had the severe impairments of degenerative disc disease post-laminectomy with radiculopathy, type II diabetes mellitus, diabetic peripheral neuropathy, obesity, depressive disorder, and post-traumatic stress disorder. (Tr. 12). The ALJ found a number of plaintiff's other conditions to be non-severe impairments, including her spinal infection (discitis) and right shoulder rotator cuff injury. (Tr. 13–14). These latter two conditions, the ALJ noted, did not satisfy the durational requirement. Plaintiff argues that these two impairments lasted 12 months or longer and had more than a minimal effect on her ability to do basic work activities, and thus should have been considered severe.

To establish entitlement to disability benefits, a plaintiff must have a medically determinable impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 20 C.F.R. §§ 404.1505(a), 404.1509 (titling this prerequisite the "duration requirement"). An impairment is severe if it significantly limits an individual's physical or mental abilities to do basic work activities. SSR 96-3p. An impairment is not severe if it does not significantly limit or has no more than a minimal effect on the plaintiff's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521. "To be found disabled, an individual must have a medically determinable 'severe' physical or mental impairment or combination of impairments that meets the duration requirement." SSR 96-3p.

With respect to plaintiff's spinal infection, the ALJ noted that plaintiff underwent a laminectomy procedure at the L5-S1 level of the lumbar spine in April 2013. (Tr. 13). She underwent an MRI scan of the lumbar spine on July 25, 2013 after experiencing worsened pain following the surgery, which showed edema within the left posterior paraspinal tissues at the L4-S1 levels. A second MRI scan on August 2, 2013 showed edema in that region again, as well as involvement of the left epidural space medial to the left facet, the left margin of the L5-S1 disc, and the medial left paraspinal muscles adjacent to the spinal process. Because these findings were thought to represent an inflammatory reaction, plaintiff was hospitalized and treated with antibiotics. On August 13, 2013, she was discharged with a diagnosis of discitis. Between August 14, 2013 and October 17, 2013, plaintiff underwent a two-month course of intravenous antibiotics, monitored by in-home health care nurses. She experienced some improvement of her back pain symptoms, but in December 2013 she required a hospitalization for treatment of recurrent back pain, thought potentially to be due to a paraspinal infection or epidural abscess. An additional MRI scan of the lumbar spine revealed a mild, progressive increase in the left L5 vertebral body enhancement and edema. These findings were thought to represent an inflammatory and post-operative scarring process. A biopsy of the L5 vertebra performed later that month showed marrow fibrosis but no sign of osteomyelitis. As the ALJ noted, the record contains no further objective medical evidence showing persistence or recurrence of plaintiff's spinal infection after December 2013. Thus, plaintiff has not shown through medical evidence that her spinal infection lasted or was expected to last at least 12 consecutive months. Based on the Court's review of the medical record confirming

the ALJ's summary of plaintiff's medical history with regard to her spinal infection, the ALJ did not err in finding plaintiff's spinal infection to be non-severe.

With respect to plaintiff's right shoulder rotator cuff injury, the ALJ noted that plaintiff reportedly fell in February 2012 and sustained a right shoulder injury. (Tr. 13). At a primary care appointment in April 2012, she exhibited tenderness to palpation of the shoulder, in addition to pain with shoulder rotation and positive impingement signs. Thereafter she was diagnosed with a rotator cuff injury of the right shoulder. Plaintiff reportedly underwent surgical repair of this injury on June 5, 2012. The ALJ found that the record contains no additional medical evidence regarding plaintiff's right shoulder impairment, other than one isolated finding of slightly decreased range of motion of the right shoulder at a neurological consultative examination in March 2014. The ALJ further found that the medical evidence does not show plaintiff complained of right shoulder pain or any associated functional limitations to her treatment providers after June 2012. The Court has reviewed the medical evidence in the record and confirmed the ALJ's summary of the evidence as it relates to plaintiff's right shoulder rotator cuff injury. As such, plaintiff's shoulder condition did not last at least 12 consecutive months as required to satisfy the durational requirement, and the evidence supports the ALJ's finding that plaintiff's rotator cuff injury was non-severe.

## B. **The ALJ's Evaluations of the Medical Opinions**

Plaintiff also contends that the ALJ erred in failing to provide adequate reasons for rejecting the contrary opinions of the examining medical consultants and for according "little, if any" weight to the opinion of plaintiff's nurse practitioner. Plaintiff does not identify the medical consultants and nurse

practitioner by name in the argument section of her brief. However, she discusses the opinions of consultative examiners Riaz Naseer, M.D. and Vivian Knipp, Ph.D. and psychiatric nurse JoAnn Shew, R.N. in the brief's statement of facts. Her contention regarding the ALJ's error in failing to explain the weight given to medical opinions appears to refer to these medical consultants and treating nurse.

The Social Security Administration's regulations define "medical opinions" as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity" of a plaintiff's impairments, including symptoms, diagnosis, what the plaintiff can do despite his or her impairment, and the plaintiff's mental or physical restrictions. 20 C.F.R. § 404.1527(a)(2). "Acceptable medical sources" are licensed physicians, licensed or certified psychologists, or other licensed medical specialists for purposes of establish a medically determinable impairment in their field of specialty only. 20 C.F.R. § 404.1513(a). Nurse practitioners are considered "other sources" the Social Security Administration may use evidence from to consider the severity of a claimant's impairment and how it affects the claimant's ability to work. § 404.1513(d). However, "other sources" cannot establish the existence of a medically determinable impairment. Sloan v. Astrue, 499 F.3d 883, 888 (8th Cir. 2007) (citing SSR 06-3p).

### 1. Dr. Naseer

In determining plaintiff's physical RFC, the ALJ gave some weight to the opinion of neurological consultative examiner Dr. Naseer. (Tr. 24–25). Dr. Naseer examined plaintiff and completed a physical medical source statement for plaintiff on March 15, 2014, as summarized in plaintiff's medical history above. (Tr. 992–

94, 998–1003).   The ALJ found that Dr. Naseer's opinion regarding plaintiff's abilities to lift, carry, stand, walk and sit was generally consistent with and supported by the objective medical evidence in the record.  However, the ALJ found that Dr. Naseer's findings on examination and the other medical evidence in the record did not support the degree of postural, manipulative, and environmental limitations articulated.   Specifically, while Dr. Naseer opined that plaintiff could never stoop, diagnostic imaging, including lumbar spine MRI exams, CT scans and radiography, showed only mild to minimal degenerative changes of two levels of the lumbar spine, suggesting that plaintiff retained the ability to stoop on an occasional basis.  (Tr. 522, 538, 554, 557, 594, 979–80).

Also, the ALJ found that Dr. Naseer's opinion that plaintiff had limited abilities to use her bilateral upper extremities for pushing, pulling and other manipulative activities was unsupported by the record.  On examination, Dr. Naseer found that plaintiff had normal bilateral upper extremity and grip strength with normal range of motion in the wrists and near-normal range of motion in the elbows.  As noted by Dr. Naseer, plaintiff was able to fully extend her hands, make fists, and oppose the fingers.  Dr. Naseer did not note any sensory or other objective abnormalities of either hand.  Plaintiff's treating physician also had observed her exhibiting normal bilateral upper extremity and grip strength.  (Tr. 550–51).  The record contains no objective findings of abnormal grip strength, upper extremity strength, upper extremity sensation, coordination, or fine or gross motor skills.  Furthermore, the ALJ noted that plaintiff had no medically determinable impairment that could reasonably be expected to limit her ability to tolerate exposure to pulmonary irritants and medical evidence did not support Dr. Naseer's opinion that plaintiff had

extremely limited abilities to tolerate exposure to noise. The record did not show that plaintiff ever expressed symptoms of phonophobia associated with her migraine headaches.

In explaining the overall weight given to Dr. Naseer's opinion, the ALJ noted that while Dr. Naseer's opinion was based on a thorough examination of plaintiff, he reviewed only a limited portion of plaintiff's prior medical records before rendering his opinion. Dr. Naseer did not have a treating relationship with plaintiff, but was a neurologist with specialized knowledge and experience. Nonetheless, the ALJ found the objective medical evidence did not entirely support Dr. Naseer's opinion regarding plaintiff's postural, manipulative and environmental limitations. As such, only some weight was given to Dr. Naseer's opinion. The ALJ fully considered Dr. Naseer's opinion, carefully explaining the aspects of Dr. Naseer's opinion that were supported by the objective medical evidence as well as the portions of his opinion that were not supported by any evidence or were inconsistent with existing evidence. As such, the ALJ properly provided sufficient reasons supported by the record as to why he assigned less weight to Dr. Naseer's consultative opinion.

### 2. Dr. Knipp

In determining plaintiff's mental RFC, the ALJ gave significant evidentiary weight to the opinion of consultative psychological examiner Dr. Knipp. (Tr. 27). The ALJ found that Dr. Knipp's opinion regarding plaintiff's mental functional limitations was consistent with and supported by her objective findings on examination and other objective medical evidence. (Tr. 988–90). Dr. Knipp's psychological opinion was based both on her own thorough examination of plaintiff as well as a review of plaintiff's psychological treatment notes. (Tr. 984–87).

Thus, the ALJ noted that Dr. Knipp's opinion provided a longitudinal perspective of plaintiff's limitations and impairments. Also, because no treating physician or psychologist provided opinion evidence as to plaintiff's mental impairments and resultant functional limitations, Dr. Knipp's opinion was particularly probative as to plaintiff's mental RFC.

However, the ALJ gave little weight to the other aspects of Dr. Knipp's opinion. (Tr. 27–28). The ALJ noted that Dr. Knipp is a psychologist and thus not an acceptable medical source capable of rendering a medical opinion regarding plaintiff's physical impairments and limitations. Also, Dr. Knipp's report did not indicate she performed any physical examination or reviewed any of plaintiff's medical records beyond plaintiff's limited mental health treatment notes. To the extent that Dr. Knipp believed plaintiff could not maintain consistent employment, the ALJ presumed this assessment was based on Dr. Knipp's perception of plaintiff's physical limitations since Dr. Knipp's opinion regarding plaintiff's mental limitations did not comport with an inability to maintain employment. The ALJ also noted that the issue of whether an individual is able or unable to work is an ultimate question reserved to the Commissioner, not a psychologist. See Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005) ("A medical source opinion that an applicant is 'disabled' or 'unable to work,' however, involves an issue reserved for the Commissioner and therefore is not the type of 'medical opinion' to which the Commissioner gives controlling weight."). Because Dr. Knipp's opinion as to plaintiff's physical limitations was not founded upon any medical expertise or review of plaintiff's medical records, the ALJ assigned little weight to this portion of her opinion. The

Court finds that substantial evidence and sufficient reasoning supports the weight the ALJ gave to Dr. Knipp's consultative opinion.

### 3. Nurse Shew

With regard to plaintiff's mental RFC, the ALJ also gave little weight to the opinion of psychiatric nurse Shew. (Tr. 28). A letter from nurse Shew dated February 14, 2013 stated that she had been providing psychotherapy twice a week for plaintiff since July 2012. (Tr. 523). Nurse Shew wrote that plaintiff's depression had worsened as her back pain increased. The record otherwise only contains nurse Shew's treatment notes from two visits in July 2012. (Tr. 513–16). The ALJ noted that an opinion from a nurse was not an acceptable medical source capable of rendering a medical opinion as defined in the Social Security Administration's regulations. See 20 C.F.R. §§ 404.1513, 404.1527(a)(2); SSR 06-3p. Also, based on the limited treatment notes from nurse Shew's appointments with plaintiff, it was difficult to ascertain whether nurse Shew's notes were consistent with her assessment. The letter from nurse Shew did not articulate any specific functional limitations arising from plaintiff's mental impairments.

Accordingly, because nurse Shew's opinion did not constitute an acceptable medical source, was not supported by contemporaneous treatment notes, and did not include any specific mental functional limitations, the ALJ gave her opinion little weight. See Travis v. Astrue, 477 F.3d 1037, 1041 (8th Cir. 2007) ("If [a medical source's] opinion is 'inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight.'") (quoting Edwards v. Barnhart, 314 F.3d 967, 967 (8th Cir. 2003)). The ALJ's refusal to rely on the single GAF score cited in the record, unsupported by treatment notes or specific mental functional limitations

from an acceptable medical source, was not in error.  See Halverson v. Astrue, 600 F.3d 922, 931 (8th Cir. 2010) (finding that the ALJ's decision not to rely on one GAF score of 40 was supported by substantial evidence in the record); see also id. (quoting Howard v. Comm'r of Soc. Sec., 276 F.3d 235, 241 (6th Cir. 2002) ("While a GAF score may be of considerable help to the ALJ in formulating the [residual functional capacity], it is not essential to the RFC's accuracy.").  Therefore, the Court finds that the ALJ properly explained sufficient bases for discounting nurse Shew's opinion.

## C.  The RFC Assessment

Finally, plaintiff argues that the ALJ erred in assessing her RFC because he did not include in the assessment specific limitations based on her spinal infection and rotator cuff injury.  Plaintiff contends that Social Security Ruling 96-8p requires the ALJ to consider the impact of both severe and non-severe impairments on her ability to work, which the ALJ failed to do.  See SSR 98-8p ("In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'  While a 'not severe' impairment(s) standing alone may not significantly limit an individual's ability to do basic work activities, it may—when considered with limitations or restrictions due to other impairments—be critical to the outcome of a claim.").

The ALJ found that plaintiff had the RFC to perform sedentary work with the following limitations:  she can occasionally stoop; cannot kneel, crouch, crawl, climb ramps, stairs or ropes; can occasionally push or pull with the bilateral upper extremities; is unable to operate any foot control operations; must avoid concentrated exposure to extreme vibration; must avoid all operational control of

moving machinery, working at unprotected heights, and use of hazardous machinery; and is limited to work that involves only simple, routine, and repetitive tasks in a low-stress job, defined as one requiring only occasional decision-making and only occasional changes in the work setting. (Tr. 20–21).

In determining plaintiff's RFC, the ALJ explicitly referred to edematous changes associated with her spinal infection in 2013. (Tr. 22–23). However, the ALJ noted that the results of overall diagnostic imaging in the record were mild. Also, the ALJ considered that plaintiff intermittently was observed to exhibit decreased range of motion of the lumbar spine. However, plaintiff consistently was observed to exhibit normal gait and had not been prescribed assistive devices or advised to abstain from any activities. The ALJ noted that plaintiff required continued medications, including narcotic pain medications and muscle relaxants, to treat her lumbar spine conditions, and these medications caused adverse side effects. The ALJ attributed limitations on the basis of these side effects, explicitly limiting plaintiff to performing work that involved only simple, routine and repetitive tasks in a low-stress job. Finally, the ALJ limited plaintiff overall to performing only sedentary exertional work based on her lumbar spine conditions. As such, the ALJ properly considered plaintiff's non-severe spinal infection as it related to her functional limitations in the RFC assessment.

As to plaintiff's non-severe rotator cuff injury, the ALJ also explicitly referred to this condition in his RFC assessment when considering the credibility of plaintiff's statements concerning the intensity, persistence and limiting effects of her symptoms. (Tr. 29–30). Specifically, the ALJ noted that plaintiff underwent surgical repair of the rotator cuff injury in June 2012, but the record contained no

additional medical evidence showing further shoulder abnormalities after that time or ongoing complaints of shoulder pain or associated functional limitations. (Tr. 30). Accordingly, the ALJ also properly considered the effect of plaintiff's non-severe rotator cuff injury on her ability to work in his RFC assessment.

## VI. <u>Conclusion</u>

For the reasons discussed above, the Court finds that the Commissioner's decision is supported by substantial evidence in the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **affirmed**.

A separate Judgment in accordance with this Memorandum and Order will be entered.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 7th day of March, 2016.